

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| YORKTOWNE SHOPPING CENTER, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Case No.: 1:10-cv-1333 |
| ) | |
| NATIONAL SURETY CORPORATION, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Plaintiff Yorktowne Shopping Center, LLC ("Yorktowne") brought this action against Defendant National Surety Corporation ("NSC") for breach of contract and for bad faith denial of Yorktowne's insurance claim. The matter comes before the Court on the parties' motions for summary judgment. Dkt. Nos. 48, 51. The parties have fully briefed and argued the motions, and the matter is ripe for disposition. For reasons stated in this Memorandum Opinion, the Court grants in part and denies in part NSC's Motion for Summary Judgment. The Court denies Yorktowne's Motion for Summary Judgment.

### JURISDICTION AND VENUE

Yorktowne is a Virginia limited liability company with its principal place of business in Great Falls, Virginia. NSC is an Illinois corporation with its principal place of business in California. The amount in controversy exceeds $75,000 exclusive of interests and costs. This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

A substantial part of the events giving rise to this claim occurred within the Eastern District of Virginia. Venue lies in this Court pursuant to 28 U.S.C. § 1391.

## FACTUAL AND PROCEDURAL HISTORY

The undisputed facts are as follows. Yorktowne owns the Yorktowne Shopping Center (the "Shopping Center") located in Fairfax County, Virginia. On March 12, 2007, Yorktowne entered a lease agreement (the "Lease") with EE Mart FC, LLC ("EE Mart") to run from June 1, 2007 through December 31, 2026. EE Mart, as lessee, operated a grocery store on the Shopping Center premises.

NSC issued an insurance policy to Ziegler Companies, LLC ("Ziegler"), the management agent for Yorktowne, with an effective policy period of July 6, 2008 to July 6, 2009 (the "Policy"). The Policy names Yorktowne as an insured, the Shopping Center as a "covered location," and fire as a "covered cause of loss."

At approximately 10:45 p.m., on January 19, 2009, a fire broke out at the grocery store, causing extensive damage. The fire forced EE Mart to vacate the rental space so it could be restored to its pre-fire condition. Prior to mid-December 2009, EE Mart consistently represented to Yorktowne that it intended to resume its grocery store operations as soon as possible.

On November 25, 2009, Yorktowne tendered the premises to EE Mart to allow EE Mart to enter and perform additional construction activities. EE Mart did not, however, return to the premises, and Yorktowne terminated the Lease on March 1, 2010.

Yorktowne gave timely and proper notice of the fire and resulting loss to NSC. Two days after the fire, an NSC claims adjuster visited the site and met with Ziegler to discuss the extent of the damage. NSC accepted coverage for the property damage resulting from the fire. The claims adjuster visited the site three or four more times during 2009 to inspect the premises, and to observe progress on its reconstruction.

Acting pursuant to the Policy, NSC paid Yorktowne a total of $3,824,022.00, with $624,022.82 in compensation for Yorktowne's loss of business income through January 19, 2010. In March 2010, NSC rejected Yorktowne's claim for additional loss of business income.

Yorktowne filed suit against NSC in Fairfax County Circuit Court for breach of contract, and for bad faith denial of coverage. NSC removed the case to this Court. Yorktowne seeks, *inter alia*, lost rental income for January 19, 2010 through January 19, 2011.

## DISCUSSION

1. Standard on summary judgment

A court may grant summary judgment only if the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. A fact is "material" only if it might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the party opposing the motion must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251-52. The party asserting that a fact cannot be or is genuinely disputed must support that assertion by citing to materials in the record, including depositions, documents, and affidavits, or by demonstrating that the materials cited by the opposing party do not establish the presence or absence of a genuine dispute. FED. R. CIV. P. 56.

2. Yorktowne's contract claim

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, so it must apply state law in interpreting the relevant contract provisions. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). To determine which state's laws should apply, the Court applies the choice-of-law rules of the Commonwealth of Virginia. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "Under Virginia law, a contract is made when the last act to complete it is performed, and in the context of an insurance policy, the last act is the delivery of the policy to the insured." *Seabulk Offshore, Ltd. v. Am. Home Assur. Co.*, 377 F.3d 408, 419 (4th Cir. 2004); *Buchanan v. Doe*, 431 S.E.2d 289, 291 (Va. 1993) ("generally, the law of the place where an insurance contract is written and delivered controls issues as to its coverage"). The policies in the present case were delivered to Yorktowne in Virginia. Therefore, Virginia contract law will govern this Court's interpretation of the insurance policy.

Virginia law treats insurance policies as any other contract. To determine the intent of the contracting parties, the court must consider the words the parties have used in the instrument. *Virginia Farm Bureau Mut. Ins. Co. v. Williams*, 677 S.E.2d 299, 302 (Va. 2009). These words are assigned their "ordinary and customary meaning when they are susceptible of such construction." *Hill v. State Farm Mut. Auto. Ins. Co.*, 375 S.E.2d 727, 729 (Va. 1989). "Provisions of an insurance policy must be considered and construed together, and any internal conflicts between provisions must be harmonized, if reasonably possible, to effectuate the parties' intent." *Williams*, 677 S.E.2d at 302.

Where the terms of a policy are "plain and clear and not in violation of law or inconsistent with public policy," a court is "bound to adhere to [them]." *Pilot Life Ins. Co. v. Crosswhite*, 145 S.E.2d 143, 146 (Va. 1965); *see also P'ship Umbrella, Inc. v. Fed. Ins. Co.*, 530

4

S.E.2d 154, 160 (Va. 2000) ("when the language in an insurance policy is clear and unambiguous, courts do not employ rules of construction; rather, they give the language its plain and ordinary meaning and enforce the policy as written"). If, however, "disputed policy language is ambiguous and can be understood to have more than one meaning," the court must "construe the language in favor of coverage and against the insurer." *Williams*, 677 S.E.2d at 302; *see also United Serv. Auto. Ass'n v. Pinkard*, 356 F.2d 35, 37 (4th Cir. 1966) ("The text writers and the cases from the appellate courts of nearly all of the states accentuate the rule that ambiguous and doubtful language must be interpreted most strongly against the insurer.") (quoting *Ayres v. Harleysville Mut. Cas. Co.*, 2 S.E.2d 303, 305 (Va. 1939)). "The question whether contract language is ambiguous is one of law, not fact." *Plunkett v. Plunkett*, 624 S.E.2d 39, 41 (Va. 2006).

Policy language that purports to exclude specific events from coverage is "construed *most strongly* against the insurer." *St. Paul Fire & Marine Ins. Co. v. S.L. Nusbaum & Co., Inc.*, 316 S.E.2d 734, 736 (Va. 1984) (emphasis added); *see also Pinkard*, 356 F.2d at 37 ("insurance policies are to be liberally construed in favor of the assured and exceptions and exclusions are to be strictly construed against the insurer") (quoting *Ayres*, 2 S.E.2d at 305). For this reason, an insurer seeking to limit coverage through an exclusion must use language that is "reasonable, clear, and unambiguous." *Williams*, 677 S.E.2d at 302; *see also Floyd v. N. Neck Ins. Co.*, 427 S.E.2d 193, 196 (Va. 1993) (courts may enforce exclusions from coverage only where the exclusions "clearly and unambiguously bring the particular act or omission within its scope").

Yorktowne claims that the Policy's terms entitle it to lost rental payments for the period of January 19, 2010 through January 19, 2011. The parties' motions refer to two provisions

under which Yorktowne could potentially recover these payments: (1) the "Business Income Provision," and (2) the "Lost Lease Provision." The Court will address each provision in turn.

    a. The Business Income Provision

The relevant portions of the Business Income Provision read as follows:

g. Business Income

We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your **operations** during the **period of restoration**. We will also pay for the actual loss of Business Income you incur during the period that:
(1) Begins on the date property is actually repaired, rebuilt or replaced and operations are resumed; and
(2) Ends on the earlier of:
    (a) The date you could restore operations with reasonable speed, to the condition that would have existed if no direct physical loss or damage occurred; or
    (b) 365 consecutive days after the date determined in (1) above.

\*\*\*

**Business Income** means the:
(1) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and
(2) Continuing normal operating expenses incurred, including payroll.

Def.'s Mem. in Supp. of Mot. Summ. J. ("Def.'s Mem."), Ex. 32, Policy 129-30.

The Policy defines "operations" as follows:

14. **Operations** means:

a. Your business activities occurring at the described premises; and
b. The tenantability of the described premises, if coverage for Business Income includes rents.

*Id.* at 87.

The Business Income Provision contains two components. The first sentence of the provision entitles the insured party to loss of business income due to suspension of operations during the period of restoration. This component is not at issue in this case. The parties agree

6

that NSC has paid Yorktowne for lost rent during the period of restoration. That period began January 19, 2009, and ended January 19, 2010.

Yorktowne's claim for additional rental income arises out of the *second* sentence of the Business Income Provision—the "Extended Coverage Provision." This provision contemplates that NSC will pay for any actual loss of business Yorktowne incurs, beginning on the date the premises were repaired and operations resumed (the "Repair Date"), and ending on the date that Yorktowne could restore operations with reasonable speed to the condition that would have existed had no direct physical loss or damage occurred (or one year after the Repair Date).

To assess the potential extent of this coverage, the Court must determine the meaning of "operations" as it appears in the Extended Coverage Provision. The Policy specifically states that words and phrases appearing in boldface have special meaning. Policy 53. "Operations" appears in boldface type in the first line of the Business Income Provision. Here, "operations" clearly imports the Policy definition (i.e., "tenantability of the premises"). In the Extended Coverage Provision, however, "operations" does not appear in boldface. NSC encourages the Court to read this provision to import the Policy definition as well.

"A party's failure to use boldface type wherever it uses a contractually defined term does not require the term to have some other meaning." *Manor Care, Inc. v. First Specialty Ins. Corp.*, No. 3:03CV7186, 2006 WL 2010782, at *2 (N.D. Ohio July 17, 2006); *see also Miller v. ACE USA*, 261 F. Supp. 2d 1130, 1137 (D. Minn. 2003) (holding that the "slight ambiguity" resulting from drafter's failure to use boldface type "does not ineluctably lead to the conclusion that the drafter is to lose"). Rather, the court must consider the Policy as a whole to determine whether selective use of boldface print constitutes scrivener's error, or instead indicates that the parties intended the term to carry different meanings in different contexts. *See, e.g., Basler*

*Turbo Conversions LLC v. HCC Ins. Co.*, 601 F. Supp. 2d 1082, 1088 (E.D. Wis. 2009) (holding that policy definition did not apply to non-boldface use of "occurrence" where boldface use of "occurrence" appeared in provisions for one form of liability coverage but not another).

As previously discussed, the period of coverage contemplated by the Extended Coverage Provision begins on the date operations resume, and ends on the date that the insured could restore operations to the condition that would have existed but-for the covered event. The "essential nature and purpose" of such an insurance provision "is to protect the earnings which an insured would have enjoyed had there been no interruption of business." *Keetch v. Mut. of Enumclaw Ins. Co.*, 831 P.2d 784, 786 (Wash. Ct. App. 1992) (citing *Northwestern States Portland Cement Co. v. Hartford Fire Ins. Co.*, 360 F.2d 531 (8th Cir. 1966)). An extended recovery period specifically provides coverage in the event that a business resumes operations, but continues to suffer losses due to the interruption. For example, in *Duane Reade, Inc. v. St. Paul Fire and Marine Insurance Co.*, the court held that the extended recovery provision "guarantees Duane Reade its pre-9/11 profits until the earlier of when Duane Reade can restore business at its WTC store to the condition it would have been in had the WTC not been destroyed or twelve months after the Restoration Period ends." 411 F.3d 384, 393 (2d Cir. 2005).

The flaw in NSC's proposed interpretation, which defines "operations" as "tenantability," is that it renders the Extended Coverage Provision meaningless; the date triggering coverage and the date extinguishing coverage are one in the same. Under the rules of contract interpretation, "[n]o word or clause is to be treated as meaningless if any reasonable meaning consistent with the other parts of the contract can be given to it." *Ames v. Am. Nat'l Bank of Portsmouth*, 176

S.E. 204, 216 (Va. 1934). The question, then, is whether "operations," and the clause in which it appears, are subject to a reasonable interpretation that is consistent with the Policy as a whole.

Yorktowne's only business operation relevant to the Policy is the rental of the insured premises. *See* Compl. ¶¶ 5-7; Answer ¶¶ 5-7. It is therefore sensible to construe "operations," as that term appears in the Extended Coverage Provision, to mean "rental of the insured premises." Moreover, for the reasons that follow, this definition of "operations" accommodates a coherent, rational interpretation of the Policy as a whole, providing for an actual period of extended coverage.

Had Yorktowne operated its own grocery store on the premises, as in *Duane Reade*, "operations" would have resumed on the day the doors opened to customers. As a landlord involved in "rental of the insured premises," however, Yorktowne's only customers were its prospective tenants. Therefore, Yorktowne's business operations resumed on the date that it made the premises available for occupation by a tenant. It is undisputed that Yorktowne tendered the premises to EE Mart on November 25, 2009. At this point, Yorktowne had satisfied its obligations under its lease with EE Mart, and the next step was for EE Mart to reoccupy the space and resume rent payments. The Court therefore holds that Yorktowne's "operations" resumed on November 25, 2009.

EE Mart did not return to the premises, nor did it resume paying rent. Therefore, although Yorktowne had resumed operations, those operations had not returned to pre-fire conditions in terms of profitability; Yorktowne was not collecting rent. To analogize to the *Duane Reade* example, Yorktowne had opened the doors of its business, but no customers had returned to purchase Yorktowne's product. On this state of facts, the Court holds that the Extended Coverage Provision entitles Yorktowne to the actual loss of business income it

incurred, beginning on November 25, 2009 and ending on the earlier of: (1) the date Yorktowne could restore operations with reasonable speed to the condition that would have existed had the fire not occurred; or (2) November 25, 2010.

To summarize, the Court holds that "operations," as it appears in non-boldface type in the Extended Coverage Provision, does not import the Policy definition of the term. The Policy definition would render the provision meaningless, whereas interpreting "operations" to mean "rental of the subject premises" results in a reasonable, coherent construction of the provision as a whole. Even if another reasonable construction of "operations" is possible in this context, the Court must construe the disputed language in favor of coverage and against the insurer. *Williams*, 677 S.E.2d at 302. NSC's Motion for Summary Judgment on these grounds is therefore denied.

Although Yorktowne may pursue recovery under the Extended Coverage Provision, genuine issues of material fact remain regarding *when* Yorktowne could have restored operations with reasonable speed. Issues of material fact also remain as to the applicability of NSC's affirmative defenses. *See* Answer ¶ 36 (citing Policy requirement that, in event of loss or damage, Yorktowne "[r]esume all or part of [its] **operations** as quickly as possible."). For this reason, Yorktowne's Motion for Summary Judgment is also denied.

    b. The Lost Lease Provision

The relevant portion of the Lost Lease Provision reads as follows:

> We will pay for loss you sustain due to the cancellation of lease contracts by your tenants when the reason for cancellation of the lease is direct physical loss or damage to the leased premises caused by or resulting from a Covered Cause of Loss during the policy period. However we will not pay for loss due to the cancellation of lease contracts which do not apply to a covered location.
>
> We will not pay for any loss caused by your cancellation of a lease, the suspension, lapse or cancellation of any license or any other consequential loss.

Policy 133.

The parties agree that Yorktowne terminated EE Mart's lease on March 1, 2010. Such a cancellation of the lease would appear to come "clearly and unambiguously" within the scope of the provision's exclusionary language. *Floyd*, 427 S.E.2d at 196. Yorktowne argues, however, that EE Mart functionally "cancelled" the Lease by refusing to reoccupy the premises once Yorktowne had tendered them. EE Mart's actions and representations, according to Yorktowne, constituted an anticipatory repudiation of the Lease.

To constitute an anticipatory breach, "it must appear that the party bound under a contract has unequivocally refused to perform, or, as the Supreme Court put it . . . there must be 'a positive, unconditional, and unequivocal declaration of fixed purpose not to perform the contract in any event or at any time.'" *City of Fairfax v. Washington Metro. Area Transit Auth.*, 582 F.2d 1321, 1326 (4th Cir. 1978) (quoting *Dingley v. Oler*, 117 U.S. 490, 502 (1886)); *see also* 23 RICHARD A. LORD, WILLISTON ON CONTRACTS § 63:45 (4th ed. 1999) ("It is invariably stated in the decisions that in order to give rise to an anticipatory breach of contract, the defendant's refusal to perform must have been positive and unconditional."). The Fourth Circuit's opinion in *Frank F. Pels Co. v. Saxony Spinning Co.*, 287 F. 282 (4th Cir. 1923) is particularly instructive here. In *Saxony Spinning*, the defendant had contracted with the plaintiff to deliver "certain quantities of cotton yarns" on a monthly basis. *Id.* at 283. Numerous disputes arose during performance of the contract, and the defendant notified the plaintiff that it would cease performance until the parties reached a "satisfactory arrangement." *Id.* at 288. The Fourth Circuit rejected the plaintiff's argument that the defendant had, in so doing, breached the contract, holding that the defendant's representations were not "an absolute renunciation of the contract"; rather, "the whole matter was left open for adjustment and negotiation between the

11

parties." *Id.* at 290. The Court concluded that such a conditional repudiation did not constitute an "absolute" and "unequivocal" refusal to comply so as to qualify as anticipatory breach. *Id.* at 290.

The lease agreement between Yorktowne and EE Mart specified that, should an insured casualty damage or destroy the premises to the extent that repairs could be completed within 12 months, Yorktowne had the option of rebuilding the premises. If Yorktowne elected to rebuild, the Lease would remain in full force and effect. During reconstruction, and after the tender of the premises, EE Mart continuously represented to Yorktowne that it would reoccupy the premises as soon as Yorktowne released EE Mart from collateral litigation. *See* Def.'s Mem., Ex. 26, Sept. 22, 2009 Letter from EE Mart's CFO to Richard Ziegler ("We cannot let our suppliers to deliver equipments to the store, if we do not have settlement with you." [*Sic*]); Def.'s Mem., Ex. 29, Nov. 25, 2009 Letter from EE Mart's CFO to Richard Ziegler ("We would like to sign the settlement and start the operations as fast as possible."). Yorktowne, however, refused to terminate the litigation until EE Mart reentered the premises. *See* Pl.'s Mem. in Supp. of Mot. Summ. J., Ex. 4, Dep. of Richard Ziegler 89:3-16 ("Our position was that we weren't going to withdraw the lawsuit until they reopened and fulfilled their obligations.").

Here, just as in *Saxony Spinning*, a contracting party indicated that it would not proceed with its obligations unless certain conditions were met. The case law clearly establishes that such representations do not constitute anticipatory breach. Yorktowne's claim that it did not "cancel" the Lease in March 2010 because EE Mart had already breached fails accordingly.

Yorktowne argues that this reading of the contract places it in a "Catch-22": were Yorktowne to cancel the Lease, it would forfeit coverage; if, on the other hand, Yorktowne continued waiting for EE Mart to perform, NSC could argue that Yorktowne had failed to

mitigate damages. *See* Policy 69-70 (stating that in event of loss or damage, insured must "[r]esume all or part of [its] **operations** as quickly as possible"). In response to this perceived quandary, the Court would simply note that Yorktowne's refusal to withdraw its lawsuit against EE Mart, though possibly warranted from a strategic standpoint, was a decision over which Yorktowne maintained total control. Yorktowne had the power to remove the impasse at any time; it was not without options. The Court also notes that the Lease itself does not appear to specify *when* EE Mart was obligated to retake the premises. Had the Lease contained clearer terms, Yorktowne could potentially make a stronger argument for breach of contract. In any event, neither concepts of fairness nor the Policy's language dictate that the risk for these contractual blind-spots and failed negotiations should fall on the shoulders of the insurer.

3. Bad faith

Under Virginia law, an insured is entitled to recover costs and attorney's fees if the court determines that "the insurer, not acting in good faith, has either denied coverage or failed or refused to make payment to the insured under the policy." Va. Code § 38.2-209. In evaluating the conduct of an insurer under this section, the court must apply a "standard of reasonableness" taking account of:

> whether reasonable minds could differ in the interpretation of policy provisions defining coverage and exclusions; whether the insurer had made a reasonable investigation of the facts and circumstances underlying the insured's claim; whether the evidence discovered reasonably supports a denial of liability; whether it appears that the insurer's refusal to pay was used merely as a tool in settlement negotiations; and whether the defense the insurer asserts at trial raises an issue of first impression or a reasonably debatable question of law or fact.

*Cuna Mut. Ins. Soc. v. Norman*, 375 S.E.2d 724, 727 (Va. 1989).

The undisputed record demonstrates that NSC's representative, Jean Hargrove ("Hargrove"), remained in regular contact with Yorktowne as its public adjuster, and that she

repeatedly visited the building site. On March 18, 2010, NSC received Yorktowne's claim for additional coverage, and Hargrove responded with a six-page letter explaining NSC's coverage position. For reasons stated in previous sections of this opinion, the Court does not agree with all facets of this position. Nonetheless, the Court holds that reasonable minds could differ in interpreting the Policy. Furthermore, contrary to Yorktowne's contentions, NSC was under no obligation to investigate EE Mart's financial status or to determine when EE Mart could resume operations. Given Yorktowne's coverage position, no information obtained through such efforts would have been material. NSC is entitled to judgment as a matter of law on Yorktowne's claim of bad faith.

## CONCLUSION

For the foregoing reasons, NSC's Motion for Summary Judgment is granted in part and denied in part, and Yorktowne's Motion for Summary Judgment is denied.

Alexandria, Virginia
June 15, 2011

/s/
Liam O'Grady
United States District Judge